FILED
OCT 14 2020
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal No. SA20CR0487 FB |
| Plaintiff, | ) INDICTMENT |
| v. | ) |
| AMBER PRICE, (1) and CHRISTOPHER CRUZ, (2) | ) **Count 1**: 18 U.S.C. § 371 Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks; |
| Defendants. | ) **Counts 2-3 and 10-11**: 42 U.S.C. § 1320a-7b (b)(1) Soliciting and Receiving Illegal Health Care Kickbacks; |
| | ) **Count 4**: 18 U.S.C. § 1349 Conspiracy to Commit Health Care Fraud; |
| | ) **Counts 5-9**: 18 U.S.C §§ 1347 and 2 Health Care Fraud, and Aiding and Abetting. |
| | ) **FORFEITURE** |

**INDICTMENT**

The Grand Jury charges:

**General Allegations**

At all times material to this Indictment, unless otherwise specified:

**The Defendant and Related Parties**

1. Defendant **Amber PRICE** was a resident of San Antonio, Texas, and an employee of Kindred Home Health, a medical services provider. **Amber PRICE** was also paid by various area pharmacies and their marketers during this time period.

Indictment – Page 1

2. Defendant **Christopher CRUZ** was a resident of San Antonio, Texas, and owned and operated CP Cruz Management Group, LLC, a medical marketing business. **Christopher CRUZ** was paid by various pharmacies and laboratories to increase their volume of prescriptions, lab analysis, and other billable procedures.

3. Co-Conspirator 1 (CC-1) was a resident of Bexar County, Texas, and a fully licensed medical doctor. CC-1 was employed by various medical providers within the San Antonio area, including as a hospitalist at Hospital 1.

### Compounded Drugs Generally

4. In general, "compounding" is a practice in which a licensed pharmacist, a licensed physician, or a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient. Compounded drugs are not FDA-approved, that is, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs. Generally, the practice of compounding drugs is regulated by the state where the compounding is done.

5. Compounded drugs may be prescribed by a physician when an FDA-approved drug does not meet the health needs of a particular patient. For example, if a patient is allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded drug can be prepared excluding the substance that triggers the allergic reaction.

6. Due to their potential complexity and level of customization, compounded drugs can be very expensive to produce. Compounded medications are frequently billed to insurance providers at thousands of dollars for a single month's supply.

### Medicare

7. Medicare Program ("Medicare") was a federally funded and administered healthcare program providing benefits to individuals sixty-five (65) years of age or older, or disabled. The

program was administrated through the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services. Medicare was paid for through federal income and payroll taxes. This program is referred to collectively herein as "Medicare". Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program" as defined by 42 U.S.C. Section 1320a-7b(f).

8. Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a unique Medicare identification number that was used to process bills linked to that beneficiary.

9. Medicare paid for reasonable and necessary medical services provided to individuals and families who are deemed eligible. Medical service providers were required to be registered with Medicare in order to receive reimbursements. Service providers enrolled with Medicare received a unique provider number to identify themselves when submitting Medicare claims.

10. Medicare was subdivided into multiple Parts. Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered physician services and outpatient care. Parts A and B were known as the "original fee-for-service" Medicare program, in which Medicare paid health care providers fees for services rendered to beneficiaries.

11. Medicare Part D subsidized the cost of prescription drugs for Medicare beneficiaries in the United States. In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies approved by Medicare. Those companies were often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan

could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription. Part D could be used to cover the cost of compounded prescriptions.

12. To participate in Medicare, providers were required to submit an application in which they agreed to comply with all Medicare-related laws and regulations. Per the provider agreement with Medicare, providers had a duty to become educated with and knowledgeable of the contents and procedures of the Medicare program. Providers were given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

13. The Federal Anti-Kickback Statute is a law prohibiting service providers from paying or receiving money in return for inducing the referral of a patient or service being paid for by Federal funds, including the Medicare program. To receive Medicare funds, enrolled providers agreed to, and were required to abide by, the Anti-Kickback Statute and other laws and regulations.

14. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company. When submitting, or causing claims to be submitted, under the provider's unique personal identification number, a provider was certifying that the services were properly rendered and were medically necessary. Medicare paid claims submitted by providers through automatic deposits and by checks issued to the provider.

15. A Medicare claim for reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the service provided to the beneficiary, the date the service was provided, the cost of the service, and the name and unique provider identification number of the physician or health service provider who prescribed or ordered the service.

16. CC-1 was an enrolled Medicare provider. **Amber PRICE** was employed by Kindred Home Health, which was an enrolled Medicare provider.

### The FEHBP

17. The Federal Employees Health Benefits Program (FEHBP) was a federally-funded health benefit program provided by the federal government for federal employees, retirees, and their eligible spouses and dependent children. The Office of Personnel Management (OPM) administered the FEHBP. OPM contracted with a number of different health insurance plans to pay healthcare and prescription claims on behalf of the FEHBP.

18. FEHBP was a "health care benefit program" as defined by 18 U.S.C. Section 24(b).

19. FEHBP provided coverage for certain prescription drugs, including compounded drugs, as long as they were medically necessary and prescribed by a licensed medical professional.

### The TRICARE Program

20. TRICARE was a health care program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE beneficiaries. The Defense Health Agency ("DHA"), an agency of the DOD, was the entity responsible for overseeing and administering the TRICARE program.

21. TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). TRICARE was also a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(t). TRICARE was therefore covered by the Anti-Kickback Statute.

22. TRICARE provided coverage for certain prescription drugs, including compounded drugs that were medically necessary and prescribed by a licensed medical professional.

23. TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies. If a beneficiary chose a network pharmacy, the pharmacy would collect any applicable co-pay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to benefit administrator Express Scripts, which would in turn adjudicate the claim and reimburse the pharmacy directly or through a Pharmacy Services Administrative Organization. To become a network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

## The Medicaid Program

24. The Texas Medicaid program ("Medicaid") was a federal and state funded health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including Texas. Individuals who received benefits under the Medicaid program were similarly referred to as "beneficiaries."

25. Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid were reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covered these costs if, among other requirements, they were medically necessary and ordered by a physician.

26. Medicaid was partially funded by Federal tax dollars and is therefore a "health care benefit program" as defined by 18 U.S.C. Section 24(b). Medicaid was also a "Federal health care

program" as defined by 42 U.S.C. Section 1320a-7b(f). Medicaid was thus covered the by Anti-Kickback Statute

27. CC-1 was an enrolled Medicaid provider. **Amber PRICE** was employed by Kindred Home Health, which was an enrolled Medicaid provider

### The Prescription Drug Fraud and Kickback Scheme

28. From on or about June of 2014, and continuing until on or about April of 2019, defendants **Amber PRICE, Christopher CRUZ,** and CC-1, along with others known and unknown to the Grand Jury, engaged in an ongoing conspiracy to create and submit fraudulent prescriptions for reimbursement to Medicare, Medicaid, the FEHBP, TRICARE, and other private insurance companies.

29. It was a purpose of the conspiracy for **Amber PRICE** and others to receive illegal kickback payments from marketers, including defendant **Christopher CRUZ,** who were paid by pharmacies in return for supplying them with signed prescriptions.

30. It was a further purpose of this conspiracy to increase the volume of prescriptions provided by **Amber PRICE** to the pharmacies by creating fraudulent, medically unnecessary prescriptions.

### Manner and Means of the Prescription Drug Fraud and Kickback Scheme

31. As a medical doctor, CC-1 was authorized to dispense and write prescriptions for medications in the course of his/her medical practice for a legitimate medical purpose. **Amber PRICE** was not a doctor and had no legal authority to write or dispense prescriptions.

32. During the time period specified in the indictment, **Amber PRICE** developed relationships with multiple San Antonio area medical services "marketers", including defendant **Christopher CRUZ,** to receive illegal kickbacks in return for providing signed prescriptions.

These marketers were paid by pharmacies to increase the volume of their prescription business. Once the pharmacy filled the prescription, they would bill insurances, including Medicare, Medicaid, and the other federal programs listed above, for the service. The marketer would then be paid by the pharmacy, and the marketer would in turn pay **Amber PRICE** a percentage of their own payment.

33. Several of the prescriptions produced in this scheme were for compound pain creams. At the time, pharmacies billed public and private insurance up to thousands of dollars for each compound prescription.

34. In most instances, the prescription needed to include the name and personal identifying information of the patient in order to be accepted by the pharmacy and billed to the insurance provider. The prescription also had to be signed by the patient's treating doctor.

35. As a result of his/her employment at Hospital 1, CC-1 had access to patient registration information sheets. These sheets were created when a patient was admitted to the hospital, and would contain their name, identifying information, and insurance carrier. This information would be entered onto a form which CC-1 and **Amber PRICE** referred to as "facesheets".

36. CC-1 would take these facesheets, and copies of these facesheets, and provide them to **Amber PRICE** for the purpose of filling out a fraudulent prescription.

37. CC-1 knowingly allowed **Amber PRICE** to forge his/her signature on prescription forms.
CC-1 also signed at least one blank prescription form, which he/she gave to **Amber PRICE** and allowed to be photo-copied.

38. Once **Amber PRICE** received the facesheets, she would use the information contained on them to fill out the rest of a pre-signed or photo-copied prescription form. Upon completing

the form, **Amber PRICE** would then either fax the prescription to one of her marketers, or send it directly to the pharmacy herself. The prescription would then be filled and sent to the patient via the mail. The pharmacy would then bill the patient's insurance carrier for filling the prescription, and subsequently pay the marketer, who would then in turn pay **Amber PRICE**.

39. **Amber PRICE** kept track of the number of prescriptions sent to the pharmacies, and would communicate with the marketers, including co-defendant **Christopher CRUZ**, to confirm the number of successfully filled prescriptions. **Amber PRICE** was paid on a per-prescription basis by the marketers.

40. Because **Amber PRICE** was creating at least some of these prescriptions by herself, they were medically unnecessary and not issued for any legitimate purpose. In multiple instances, patients who received the medications at their homes made complaints to the pharmacies and law enforcement that they were receiving unwanted and unneeded medication.

41. CC-1 was aware that **Amber PRICE** would fill out the prescription forms without having any contact with the patients, and without any medical training to determine whether the prescriptions were actually appropriate and necessary.

42. CC-1 was aware that **Amber PRICE** was creating these fraudulent prescriptions in order to receive a kickback payment, and provided **Amber PRICE** with the facesheets to facilitate the scheme.

43. At least some of the patients whose prescriptions were generated in this manner were Medicare, Medicaid, FEHBP, or TRICARE beneficiaries, whose prescriptions were ultimately paid for by public funds. Thus, the payments received by **Amber PRICE**, via the marketers, consisted at least partially of money from Federal insurance programs.

44. **Christopher CRUZ** was one of multiple marketers who paid **Amber PRICE** a kickback based upon the number of prescriptions she was able to send to designated pharmacies.

### Overt Acts

45. In furtherance of the conspiracies, and to accomplish their object and purpose, the conspirators committed and caused to be committed, in the Western District of Texas, and elsewhere, overt acts including, but not limited to, the following:

   a. CC-1 gave patient admission facesheets to **Amber PRICE** for the purpose of creating fraudulent prescriptions.

   b. CC-1 signed blank prescription forms and allowed **Amber PRICE** to fill the forms out based upon information contained in the patient facesheets.

   c. CC-1 allowed **Amber PRICE** to forge his/her signature, and to use photocopies of his/her signature to create the prescriptions.

   d. CC-1 actively screened the facesheets and made notations on them before providing them to **Amber PRICE** to indicate which patients were more likely to successfully accept the prescription and billing without complaint.

   e. CC-1 would respond to complaints from pharmacies regarding patients receiving unwanted prescriptions and state that he/she had personally authorized the prescription. In fact, **Amber PRICE** had filled out the prescription information herself in at least some of these instances.

   f. **Amber PRICE** received the facesheets from CC-1 and used them to fill out pre-signed or photocopied prescription forms where the desired medications were identified with check boxes.

g. **Amber PRICE** sent the filled out prescription forms to at least two different marketers and to multiple different pharmacies to be filled.

h. **Amber PRICE** kept records of the patients referred to these marketers to monitor the amount of money that she should be paid as an illegal kickback in return for sending in the prescriptions.

i. On or about September 4, 2014, **Amber PRICE** received $9,379.30 as an illegal kickback payment in return for sending prescriptions to a pharmacy, which included prescriptions paid for by Medicare and TRICARE.

j. On or about June 3, 2016, **Amber PRICE** received $2,915.83 as an illegal kickback payment in return for sending prescriptions to a pharmacy, which included prescriptions paid for by Medicare and Medicaid.

k. On or about January 10, 2019, **Amber PRICE** received $1,459.29 as an illegal kickback from **Christopher CRUZ** in payment in return for sending prescriptions to a pharmacy, which included prescriptions paid for by Medicare.

l. On or about March 20, 2019, **Amber PRICE** received $756.05 as an illegal kickback payment from **Chirstopher CRUZ** in return for sending prescriptions to a pharmacy, which included prescriptions paid for by Medicare.

m. Between June of 2014 and April of 2019, **Amber PRICE** was paid over $250,000 in kickbacks by multiple different marketers.

## COUNT ONE
### Conspiracy to Defraud the United States and to
### Pay and Receive Health Care Kickbacks
### [18 U.S.C. § 371]

46. Paragraphs One through Forty-Five of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

47. Beginning no later than June of 2014, and continuing through in or about April of 2019, in the Western District of Texas, and elsewhere, defendants

**AMBER PRICE (1), and
CHRISTOPHER CRUZ, (2)**

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is,

    a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States and the State of Texas in their administration and oversight of Medicare;

    b. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals and services for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, by receiving kickback payments for fraudulent prescriptions, at least some of which were paid for by Medicare, TRICARE, and other public insurance sources, all in violation of Title 18, United States Code, Section 371.

## COUNTS TWO AND THREE
### Soliciting and Receiving Illegal Health Care Kickbacks.
### [42 U.S.C. § 1320a-7b (b) (1)]

48. Paragraphs One through Forty-Five of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

49. Beginning no later than June of 2014, and continuing through in or about April of 2019, in the Western District of Texas, and elsewhere, defendant,

### AMBER PRICE, (1)

in violation of Title 42, United States Code § 1320a-7b (b)(1), knowingly and willfully, solicited and received any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, from multiple marketers in return for providing prescriptions to specific pharmacies, which prescriptions would be paid for in part by a Federal health care program, including, but not limited to, on or about the following dates and amounts:

| Count | Date on Check | Amount | Individual making payment |
|---|---|---|---|
| 2 | 6/3/2016 | $2,915.83 | Marketer-1 |
| 3 | 3/20/2019 | $756.05 | Christopher Cruz |

## COUNT FOUR
### Conspiracy to Commit Health Care Fraud
### [18 U.S.C. § 1349]

50. Paragraphs One through Forty-Five of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

51. Beginning no later than June of 2014, and continuing through in or about April of 2019, in the Western District of Texas, and elsewhere, the defendant,

**AMBER PRICE, (1)**

knowingly, intentionally, and unlawfully combined, conspired, confederated and agreed with others known and unknown to the Grand Jury to violate Title 18, United States Code, § 1347, namely, to execute a scheme and artifice to defraud Medicare, Medicaid, FEHBP, and TRICARE, all health care benefit programs as defined in Title 18, United States Code § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the control of said health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, by creating and submitting fraudulent prescriptions for reimbursement, all in violation of Title 18, United States Code, § 1349.

## COUNTS FIVE - NINE
### Health Care Fraud and Aiding and Abetting
### [18 U.S.C. § 1347 and 18 U.S.C. § 2]

52. Paragraphs One through Forty-Five of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

53. Beginning no later than June of 2014, continuing through in or about April of 2019, in the Western District of Texas, and elsewhere, defendant,

**AMBER PRICE, (1)**

in violation of Title 18, United States Code § 1347, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud health care benefit programs, including Medicare, Medicaid, FEHBP, and TRICARE; or to obtain by means of false and fraudulent pretenses, representations and promises, money and property owned by or under the custody and control of a health care benefit program defined in Title 18, United States Code, § 24(b), including Medicare, Medicaid, FEHBP, and TRICARE and other private insurers. Said conduct was in

connection with the delivery of, or payment for, health care benefits, items or services. As part of the execution of the scheme to defraud, and to obtain money or property owned by the health care benefit programs, **Amber PRICE**, individually, and by aiding and abetting others known to the Grand Jury, submitted, or caused others to submit, false and fraudulent claims for prescription drugs on multiple occasions, including, but not limited to, those set forth below:

| Count | Beneficiary and Insurance | Rx Fill Date | Rx No. | Amount Paid by Insurance |
|---|---|---|---|---|
| 5 | N. T. (FEHBP) | 1/29/19 | 136237 | $137.19 |
| 6 | J. M. (AETNA) | 11/12/18 | 102747 | $3,170.45 |
| 7 | B. B. (Medicare) | 2/4/19 | 136483 | $56.50 |
| 8 | M. R. (Medicaid) | 2/16/16 | 128988 | $2,854.70 |
| 9 | D.F. (AETNA) | 2/6/19 | 6002058 | $313.64 (later reversed) |

### The Home Health Care Kickback Scheme

54. Beginning no later than April 2016, and continuing through in or about February of 2019, defendant **Amber PRICE** engaged in a separate ongoing agreement with Marketer 1 (M-1) to receive illegal kickback payments from M-1 in exchange for patient referrals related to home health services. M-1 is the same individual who paid **Amber PRICE** the kickback payments related to Count Two of this Indictment.

55. The purpose of the conspiracy was for **Amber PRICE** to unlawfully enrich herself by being paid on a per-patient basis for each patient referred for home health services.

### Manner and Means of the Home Health Kickback Scheme

56. "Home health" is used herein to refer to outpatient medical services where providers go to patients' homes to administer services. Home health services are generally utilized by individuals who have a medical condition for which they require assistance for therapy, nursing services and/or daily activities (e.g., washing, dressing, feeding themselves, transporting themselves). They are frequently used for short time periods by patients who have recently had surgery or other in-patient hospital stay. A patient must be initially certified by a medical practitioner as needing home health before a home health services company will be allowed to bill an insurance provider for the services.

57. Home health care services were covered by the Medicare program, which would pay for reasonable and necessary costs related to home health.

58. **Amber PRICE** was employed during this time period by Kindred Home Health, a registered Medicare provider. **Amber PRICE** was aware of the prohibition against kickback payments for referrals.

59. M-1 held him or herself out as a marketer for various medical services providers, including agencies which provided home health. M-1, however, did not perform any legitimate marketing services, in that M-1 did not attempt to promote or advertise providers to patients, case managers, or doctors. Rather, M-1 utilized a network of health-care industry contacts, including **Amber PRICE**, who provided M-1 with the names and insurance information of individuals who could potentially qualify for home health services. This information was provided with the understanding that the sources, including **Amber PRICE**, would be paid a kickback in return by M-1.

60. In the course of her employment at Kindred, **Amber PRICE** had access to patient personal information, including insurance coverage information. When **Amber PRICE** had a patient file which she determined would not be able to be enrolled for home health services by Kindred, she would forward this information to M-1.

61. In turn, M-1 would take the patient information and send it to one of multiple other home health agencies in the area. If the patient was successfully enrolled by this other agency, then the agency, or a marketer employed by the agency, would pay M-1 an illegal kickback payment. M-1 would then pay **Amber PRICE** a percentage of this kickback payment in turn.

62. At least some of the patients referred by **Amber PRICE** to M-1 were Medicare beneficiaries. Thus, the funds received by **Amber PRICE**, from M-1, at least partially consisted of federally funded Medicare money.

## COUNTS TEN AND ELEVEN
### Soliciting and Receiving Illegal Health Care Kickbacks.
### [42 U.S.C. § 1320a-7b (b)(1)]

63. Paragraphs Fifty-Four through Sixty-Two of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

64. Beginning no later than April 2016, and continuing through in and around February of 2019, in the Western District of Texas, defendant

**AMBER PRICE, (1)**

in violation of Title 42, United States Code § 1320a-7b(b)(1) knowingly and willfully, solicited and received any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, from M-1 in return for referring patients for home health services, for which payment would be made in whole or in part by the Federal health care program Medicare, including, but not limited to, on or about the following dates and amounts:

| Count | Date | Amount |
|-------|---------|--------|
| 10 | 7/5/18 | $575 |
| 11 | 12/7/18 | $600 |

## NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
[*See* FED. R. CRIM. P. 32.2]

### I.
### Health Care Violations and Forfeiture Statute
[Title 18 U.S.C. 371, 1347, & 1349 and Title 42 U.S.C. § 1320a-7b(b)(1), subject to forfeiture pursuant to Title 18 U.S.C. 982(a)(7)]

65. As a result of the foregoing criminal violations set forth in Counts One through Eleven, the United States of America gives notice to the Defendants of its intent to seek the forfeiture of property, including the property listed below, upon conviction and as a part of sentence pursuant to FED. R. CRIM. P. 32.2 and Title 18 U.S.C. § 982(a)(7), which states:

> (a)(7) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

### II.
### Money Judgment

**Money Judgment**: An amount of money which represents the gross proceeds traceable to the violations set forth above for which each Defendant is solely liable.

### III.
### Substitute Property

If any property subject to forfeiture for the violations set forth above, as a result of any act or omission of the Defendants:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property of each Defendant, up to the value of each money judgment, as substitute property pursuant to Title 21 U.S.C. 853(p) and FED. R. CRIM. P. 32.2(e)(1).



A TRUE BILL

FOREPERSON, GRAND JURY

GREGG N. SOFER
UNITED STATES ATTORNEY

By: _____
JUSTIN CHUNG
Assistant United States Attorney

Indictment – Page 19